UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
LINZI ENSLIN SMYTH,

                 Petitioner,

    - against -                                 **MEMORANDUM OF**
                                                **DECISION AND ORDER**
ANRIC BLATT,                                  CV 09-3423 (ADS)

                 Respondent.
-----------------------------------------------------------x

**A P P E A R A N C E S:**

      BARBARA BEVANDO SOBAL, ESQ.
          Attorney for Petitioner
          300 East 64th Street, Suite 17A
          New York, New York 10065

      THE LAW OFFICE OF JEREMY D. MORLEY
          Attorney for Respondent
          230 Park Avenue, 10th Floor
          New York, New York
      BY:    Neil J. Saltzman, Esq., Of Counsel

      ANTHONY A. CAPETOLA, ESQ.
          Attorney for Respondent
          2 Hillside Avenue, Building 6
          Williston Park, New York 11596

**SPATT, District Judge.**

     This is a proceeding brought by Linzi Enslin Smyth ("the petitioner," "the mother" or "Smyth") the mother of three children and a Swiss resident, seeking the return of the children presently in visitation with their father, Anric Blatt, ("the Respondent," "the father" or "Blatt"). This Petition is brought pursuant to the Convention on the Civil Aspects of International Child Abduction ("the Hague Convention") and the International Child Abduction Remedies Act

1

("ICARA").  The three children of the parties are Keenan Blatt, 15 years of age; Alexander Blatt,

13 years of age; and Tristan Blatt, 11 years of age.  The petitioner requested that the Court

schedule an expedited hearing and reach an expedited determination, as to whether the children

have been "wrongfully retained" by their father.

During a nine day hearing held between September 8, 2009 and September 24, 2009, the

parties presented evidence and argument in support of and in opposition to the petition.  Having

reviewed the evidence, assessed the credibility of the witnesses, and considered the arguments of

counsel, the Court makes the following Findings of Fact and reaches the following Conclusions

of Law pursuant to Fed. R. Civ. P. 52(a).

## I. <u>BACKGROUND</u>

The petitioner, a British national and the respondent, a German national, were married in

Capetown, South Africa on February 10, 1994.  The three children were born to the marriage.

The parties were divorced in Switzerland on March 31, 2008.  The petitioner has the right of

custody of the three minor children, pursuant to the Swiss Judgment of Divorce, which states the

following:

> . . . 3.  Custody of the said children is awarded to Linzi Enslin Blatt, who will
> exercise that custody in accordance with clause 1 of the settlement on the
> incidental effects of the divorce dated October 2007 . . .

In addition, the addendum to the Divorce Agreement between the parties, reads as

follows:

1.      Custody

. . . a.   Linzi Smyth to have sole custody of Keenan Derek Blatt, Alexander
          Arnfried Blatt and Tristan Michael Blatt . . .

All three children left the mother's residence in Switzerland for a planned visit to their

father on July 2, 2009.  They were all scheduled to return to their mother on July 26, 2009.

However, the respondent retained the three children in New York, without the knowledge or

consent of the petitioner.  The petitioner asked the respondent to return the children to

Switzerland.  The respondent refused.  The petitioner then commenced this proceeding in an

effort to compel the respondent to return the children to Switzerland, their "Habitual Residence."

## II.  AS TO THE PROCEEDING IN THE FAMILY COURT

On July 27, 2009, the respondent initiated a proceeding in the Family Court of Nassau

County for an order of protection and other relief.  After some proceedings were heard in the

Family Court, on August 24, 2009, that Court issued a multi-faceted decision which provided

that Blatt "shall have temporary custody of the minor issue, Keenan . . . Tristan . . . and

Alexander Blatt . . .."  On September 12, 2009, this Court issued an order which provided, in

part, as follows:

> Article 16 fo the Hague Convention, art. 16, 19 I.L.M. at 1503, precludes
> a state court from determining custody rights until the competent authority
> entertaining the petition under the Hague Convention has an opportunity to decide
> whether the children should be returned to their habitual residence.  In particular,
> Article 16 provides that:
>
>> the judicial or administrative authorities of the Contracting
>> State to which the child has been removed or in which it has been
>> retained shall not decide on the merits of rights of custody until it
>> has been determined that the child is not to be returned under this
>> Convention or unless an application under this Convention is not
>> lodged within a reasonable time following receipt of the notice.

Hague Convention, art. 16, 19 I.L.M. at 1503.

The present situation–namely where there is a federal Hague Convention case and a state custody action going forward together–was addressed by the United States Court of Appeals for the Third Circuit in <u>Yang v. Tsui</u>, 416 F.3d 199, 203 (3d Cir. 2005). In <u>Yang</u>, it was stated that:

> the Hague Convention provides that any state court custody litigation be stayed pending the outcome of the Hague Convention litigation. Hague Convention, art. 16, 19 I.L.M. at 1503. Although ICARA does not contain a similar express provision, the purpose of the Hague Convention is to provide for a reasoned determination of where jurisdiction over a custody dispute is properly placed. Therefore, it is consistent with this purpose that it is a custody determination, not the Hague Convention Petition, that should be held in abeyance if proceedings are going forward in both state and federal courts.

416 F.3d at 203.

Thus, under Article 16, the provision in the August 24, 2009 order awarding the respondent temporary custody of the three boys was premature and must be vacated. By the express terms of the Hague Convention, the custody proceeding in the Family Court must await this Court's determination of Ms. Smyth's allegation that the respondent has wrongfully retained the children in the United States. In the event that this Court determines that the respondent has not wrongfully retained the children, the Nassau County Family Court would then have an opportunity to decide on the merits of the parties' respective custody rights. Until that time, any proceedings in the state court with regard to custody should be held in abeyance.

### III. <u>THE ISSUES</u>

Under the provisions of the Hague Convention, once the petitioner proves a wrongful retention or removal, the children must be returned unless the respondent can establish one of two defenses. First, that there is a grave risk that the return of the children would expose them to physical or psychological harm. Second, that a mature child or children consented to stay with the parent who has initially wrongfully retained them.

# IV.  THE HEARING

A hearing was held before this Court over nine days in September, 2009, during which time five witnesses testified.

A)  The Petitioner's Case

## LINZI ENSLIN SMYTH

The petitioner-mother was born in Durban, South Africa on November 27, 1970, and is presently 38 years of age.  The respondent-father was born in Nambia, Southwest Africa on August 12, 1970, and is presently 39 years of age.  The parties were married in Capetown, South Africa on February 10, 1994.  Their first child, Keenan, was born on May 26, 1994, in Capetown, and is presently 15 years of age.  Their second child, Alexander, was born in Johannesburg, South Africa on September 27, 1996, and is presently 13 years of age.  Their third and last child, Tristan, was born in Hong Kong on November 22, 1997, and is presently 11 years of age.  The parties left South Africa "in a big hurry", and went to Hong Kong, where they resided for six years.  Then they moved to Switzerland also "in a big hurry".  The reasons for the "big hurries" were never adequately explained.

A divorce action was commenced in December 2005, and the divorce was consummated on March 31, 2008 in Switzerland.  In December 2005, the respondent moved to New York.  In the Agreement of Divorce, in paragraph 1 it is stated that, "Linzi Smyth to have sole custody of Keenan Derek Blatt, Alexander Arnfried Blatt, and Tristan Michael Blatt".  (Pet. Ex. 14).  The Agreement also provided visitation to the father, including the summer holiday, when school finished, for a minimum of 28 days.  In 2009, the father's visitation with his three sons was to commence on June 25, 2009, and was to have concluded on July 27, 2009.

At the present time, there are proceedings still pending in the Swiss Courts. In one proceeding, there is a motion by the respondent to vacate the Divorce Agreement, and also to modify the Agreement to transfer custody of Keenan to him. Apparently, no decision has been rendered by the Swiss Court.

Prior to the circumstances leading to this proceeding the three children resided with the mother in Anzere, a small town in Switzerland. This town is a ski resort. The children live with the petitioner in a chalet. Photographs of the residence are in evidence. (Pet. Ex. 15). The petitioner testified that the children have friends in the schools in Anzere. She named some of their friends and the activities they were involved in, with photographs to support her testimony. (Pet. Ex. 16A, 16B, 17A, and 17B).

There was introduced in evidence a certification from Switzerland including a school report. (Pet. Ex. 18). In that certification it is reported that the school authorities had "no specific problem with these pupils . . .. They were well behaved toward both their classmates and their teachers. Their appearance and hygiene were always perfect . . . (and) nothing in their behavior nor in their appearance, suggested any lack of attention or support on behalf of their mother." The report went on to comment that the childrens' mother has always been present and that there were good relations between the school and the mother. The certification concluded with the following words:

> We can only wish that, for the good of the three children, the children are able to complete their compulsory schooling in Ayent in order to give them the best possible opportunities for their future careers.

The Court notes that in the "report concerning Keenan", there is the following comment as to his behavior:

Report concerning Keenan

Behaviour:

Keenan is a pupil whose behavior is reproachless.  He is polite and shows respect for his teachers and peers.  He has received no punishment during his three years in the Ayent Junior Secondary School.

Keenan is rather an introvert.  He does not particularly seek the company of his peers and often remains outside the group.  He sometimes suffers from not being well integrated into the class.  He also lacks self-confidence, is seeking his way and is extremely concerned about his future.

The petitioner further testified that she does not know what her former husband does for a living.  However, he has not paid child support since October 2008.  In this regard, legal proceedings are pending in Switzerland.  In addition, the respondent made an application in a Court in Ayent, Switzerland: (1) to extend the visitation in New York by four additional days for the 2009 summer holidays; and (2) to transfer custody of Keenan to his father.  Apparently, the Swiss Court granted the application only for Keenan "remaining an extra four days with his father."  (Pet. Ex. 25).  No decision was made on the request to transfer custody of Keenan to his father.  The petitioner testified that the decision in the custody matter is not now pending.

According to their agreement, after the summer visit with their father, the children were due to return to Switzerland on July 27, 2009.  On that date, Smyth drove to the Zurich airport. She left her home at 3:00 am and arrived at the Zurich airport at 7:20 am.  Smyth waited at the airport for the children to arrive.  They never did.  She tried to contact the respondent and/or his wife, by telephone and text message, without success.  There was no response by the respondent. She called the police and her attorney and learned that the children were at the Blatt residence in New York.  The boys were never returned to the petitioner.

On July 16, 2008, Blatt threatened not to return the children.  On July 20, 2008, Blatt sent

an unpleasant e-mail to Smyth.  The Court notes that he used some unpleasant language,

referring to her as a "stupid woman", "careless, arrogant and selfish" and a "completely selfish

and unintelligent mother".  (Pet. Ex. 36B).  The Court notes that these rude assertions never help

and only exacerbate these emotional situations.  On July 27, 2009, the respondent enrolled the

children in public schools in Oyster Bay, New York.  Keenan and Alexander were enrolled in the

Oyster Bay High School.  Tristan was enrolled in the James H. Vernon School.  (Pet. Ex. 37).

The petitioner was asked by her counsel about the "maturity" of the boys.  Her response

was as follows:

BY MS. SOBAL:

Q. Have you been in this courtroom and heard testimony that your boys are
mature, Ms. Smyth?

A. Yes.

Q. And are your boys mature?

A. Well, the children generally respect adults who they are not necessarily
familiar with, who they do not know very well.  Adults with authority.
So they tend to switch into mature, serious, well-mannered.

THE COURT: Excuse me.  They tend to switch?

THE WITNESS: Switch.  Tend to be mature, serious, very well-mannered if
it is expected of them.  That's how they've been raised.

However, when they are with family members or friends, they are
completely different people.  They are more - - they are joking about more.  They
don't come across as serious or overly mature.  They are just kids, because they
are in a relaxed environment.

BY MS. SOBAL:

Q. Are they always dressed in their Sunday best when they are meeting
adults?  Are they usually dressed in their Sunday best when they are
meeting with best (sic)?

8

A. No, not usually in their Sunday best, but they are respectfully dressed.

Q. Respectfully dressed?

A. Yes.

Tr. at 560, 561.

In a telephone conversation by Smyth with the children on August 8, 2009, they were upset, screaming, and crying that they did not want to return to Switzerland. The petitioner related that they wanted to speak about "the trial".

Smyth also discussed the constant moving and "uprooting" of their family from South Africa to Hong Kong and then to Switzerland which caused distress to the children. Also, the petitioner related the inappropriate conduct of the respondent who failed to attend the children's schools in Switzerland. She noted that he was "always absent"; didn't give the children the attention they required; and slapped the children in the presence of family and friends. In addition, she complained that her Skype video telephone calls were not complied with and the children persisted in discussing the pending legal proceedings, even though they were supposed to be prohibited from doing so. In the United States, the petitioner first saw her children at a visitation in August 12, 2009, and then on September 3rd, September 5th, and September 6th for about two hours at a time. The visits went very well.

The petitioner also testified about her visits to the Kenilworth Clinic in South Africa in June 2008. She timed that event with the childrens' June 21, 2008 visit to the respondent. Smyth testified that she told the children that she was going to the Clinic to receive treatment for cancer. She admitted that she lied to the children about the nature of the clinic visit, because she was advised by her attorney not to tell the children the true reason; her alcoholic problem. The

petitioner was at the Kenilworth Clinic for three weeks between June 5, 2008 and June 25, 2008. During that time she spoke to the children everyday, except when they were with their father.

The petitioner joined Alcoholic Anonymous ("AA") on June 5, 2008, as part of the Kenilworth Clinic treatment. She attends 3 to 4 AA meetings each week, including when she is in the United States because of this proceeding. Smyth testified that she is sober, and is in close contact with her sponser on a daily basis, 24 hours per day, 7 days per week.

The petitioner has known Robert Perris for almost six years. He is a "very, very close friend of mine and the children's". (Tr. at 600). Today, she has a close relationship with Robert Perris, who is her "partner" and with whom she had a physical relationship, which ceased in December 2008, based on the objection of the children.

The petitioner also testified that she was involved in four motor vehicle accidents in the past four years. The first accident was on December 26, 2005. On the initial brief, cross-examination, the subject of this automobile accident was pursued by counsel for the respondent. It was elicited that, at the time of the accident, the petitioner was subjected to an alcohol test by the Swiss police. Her alcohol level was either .162 or .169. Also, in the car with her at the time of this accident were all three of her children. This was a four car accident; the other three cars were parked. Keenan mentioned that his knees were injured, but he required no medical treatment. Prior to getting in the car, the petitioner drank wine at a friend's apartment in Anzere. After the accident she went home and had two tumbler glasses of whiskey before the police tested her alcohol level. As a result of this accident, the petitioner received a suspended sentence of 80 hours of community service.

In addition to the December 26, 2005 accident, the petitioner had another automobile

accident in January 2008. Her mother and the three children were in the car. It was a minor accident with property damage and no one was hurt. Also, the petitioner had a third minor motor vehicle accident in March 2009 and a fourth accident on April 28, 2009, when a deer crossed the road in front of her car.

The petitioner also commented on Blatt's conduct. She testified that Blatt gets very intoxicated on many occasions; at parties; at home; and while driving. He also was arrested for speeding while Keenan was in the car. In Hong Kong, Blatt was given a fine for speeding, while all three children were in the car.

Smyth concluded her direct testimony by her statement that she feels "that if the children don't come back to Switzerland, I do believe that I will never see the children again." (Tr. at 669). She bases that statement on the pattern of Blatt's behavior; in refusing to return the children; in making it difficult for her to contact the children; in withholding the children's passports; in refusing to pay child support; in attempting to obtain temporary custody of the children in the Family Court; and that "it doesn't stop. And I know it will continue, and he will try as hard as he can to cut me out of the children's lives". (Tr. at 671).

On continued cross-examination, Smyth was closely questioned about her Kenilworth Clinic experience. Smyth was in the South African clinic from June 5, 2008 through June 27, 2008, a period of 22 days. She then went directly to the Tharagay House, also in South Africa, on June 27, 2008, where she stayed until July 21, 2008. The petitioner was at these facilities for a total of 46 days. She was in both facilities for treatment for alcoholism. Some of the pertinent testimony in regard to the petitioner's alcoholism, is as follows:

Q.    Now, while you were in Tharagay House, did you tell them that you had been an absent mother as a result of your alcoholism?

MS. SOBAL:          Obejction, your Honor.

THE COURT:          Overruled.

A.     Yes.

Q.     And the alcoholism that you suffered from made you an absent mother because you were involved in drinking, and when you were drunk you could not properly care for the children; isn't that so?

MS. SOBAL:          Obejction, your Honor.

THE COURT:          Overruled.

A.     Can you repeat the question, please?

Q.     Sure.

I said:  You were an absent mother because when you drank alcohol during the time you drank and in recovery from a night's drinking or a day's drinking, you could not care for the children; isn't that so?

A.     Yes.

Q.     And how long had you been an absent mother as a result of your alcoholism?

A.     A few weeks prior to going to Kenilworth.

Q.     So your testimony is that sometime in May or thereabouts - -

A.     Yes.

Q.     - - that is when you started to become an absent mother?

A.     Yes.  A few weeks prior to that, yes.

Q.     Before that you were a functioning alcoholic and you were capable of caring for your children, even though you had an alcoholic disease?

A.     Correct.

Tr. at 690, 691.

The Kenilworth and Tharagay House records are in evidence. (Resp. Ex. S). Smyth testified as to the note in the record regarding her alcoholism, as follows:

Q. Now, read that, please.

A. It emerged that Robert had only stuck around for the children as Linzi hadn't been a mother to them due to her alcoholism.

Q. Read the next sentence.

A. She struggled to face this and the amount of damage her drinking had had on her relationship with the children.

Q. With her children.

A. With her children.

Q. Okay.

Tell me in your own words what damage your drinking had on your relationship with the children.

A. At the time I was defocused because of what was going on with the divorce.

Tr. at 694.

Smyth told the children that the purpose of her stay at Kenilworth was for cancer treatment. She did this partly because she didn't want this information to be related to their father. In that vein, Smyth testified in a Swiss Court proceeding, under oath, that she was hospitalized in Kenilworth because she was "suffering from severe depression caused by the pressure that was put on me by Mr. Blatt and Mrs. Laura Louise Blatt, as well as their hostility towards me". (Resp. Ex. 38). This statement was not true. In fact, the petitioner was in the Kenilworth and Tharagay facilities for 46 days for alcoholism.

Significantly, as to the "age and maturity" issue to be discussed later, Smyth conceded that, prior to filing this Hague petition, Keenan had, for a period of time told her that he wanted to live with his father in New York.

> Q. Now, prior to the time that you filed the Hague petition in this matter, Keenan had for a period of time told you that he wanted to live with his father in New York; isn't that so?
>
> A. Yes.
>
> Q. And how long had he been telling you that he wanted to live with his father in New York?
>
> A. For approximately two years.
>
> Q. Well, you had testified earlier that your son on numerous occasions, going back two years from today's date, and that being Keenan, told you he wanted to live in the United States with his dad; is that correct?
>
> A. Yes.
>
> Q. In fact, the Swiss authorities got involved with that situation, and you had corresponded with the Swiss authorities regarding the fact that Keenan did not want to stay in Switzerland anymore; is that correct?
>
> A. Correct.

Tr. at 704, 721, 722.

At the time of their divorce the parties entered into an agreement entitled:

"AGREEMENT between Anric Blatt and Linzi Smyth to put an end to divorce procedure". (Pet. Ex. 14). In this agreement, the petitioner was granted sole custody of the three children. The agreement also provided for "joint parental authority", as follows:

> 2. PARENTAL AUTHORITY
>
> a. Anric and Linzi to have joint parental authority. By this it is understood by both parties that matters including, but not limited to, education, health and religion will be discussed between both

14

parties and that neither party may make a significant decision without the consent of the other.

b.  Linzi will provide monthly updates of the children's well being and educational progress to Anric.

c.  Both parties will encourage the children to make weekly contact with the other party at all times. Verbal contact will be made at least once per week, but other contact including e-mail and videoconferencing will be available and encouraged as well.

d.  Linzi agrees to provide Anric with a detailed itinerary of any holiday before the children's departure, to include, but not limited to, flight information, address and fixed-line telephone number of where the children will be staying, etc. Linzi agrees to advise Anric in the event that any changes are made to the itinerary after the children have departed.

e.  Linzi agrees to insure that the children will contact Anric by telephone on their arrival after any significant travel (flights, etc.).

f.  Linzi agrees to maintain and keep active children's British and South African Passports. Linzi will have custody of these passports.

g.  Anric agrees to maintain and keep active children's German Passports. Anric will have custody of these passports.

h.  Linzi agrees to assist Anric, where necessary, in the renewal process for the boys German Passports, and vice versa.

The "Parental Authority" provision in the agreement states in part, that "neither party may make a significant decision without the consent of the other." Smyth conceded that she did not tell Blatt that she was leaving the children in the care of Robert Perris. She also conceded that Robert Perris had slept in bed with one of their children. In addition, on July 16, 2008, she sent an e-mail to Blatt in which she advised him that she had given the passports of her three

children to Perris and that Perris was to be contacted in the event of an emergency. (Resp. Ex. E).

The petitioner also related that on August 25, 2009, she received an e-mail from Blatt advising her "that the boys are going for treatment with Dr. Favaro who is a caring, sincere, well respected child and adolescent psychologist." (Resp. Ex. I). The e-mail further advised her that Dr. Favaro mentioned that she would be most welcome to contact him and participate in their treatment. However, she decided not to participate.

Again, on cross-examination counsel for the respondent returned to the issue of the petitioner's bout with alcohol. The petitioner acknowledged that in Kenilworth and Tharagay, she told the professionals that she had been an absent mother and that she was struggling to face this fact because of the effect her drinking had on her relationship with her children. (Tr. at 743). She also related how her drinking affected her relationship with her children. This testimony was in conjunction with the "12 Steps" which are suggestions that she is to follow, that are universal among all participants in an AA program.

Q. And if you look at 8, if you make a list - - I will rephrase slightly - - make a list of all the persons - - make a list of all the persons we had harmed and become willing to make amends to them all.

Do you see that?

A. Yes.

Q. And you knew you had to make amends for the wrongs you had done to your children; is that right?

A. Correct.

* * * * *

THE WITNESS: Your Honor, I would have to explain the program,

16

because if you are not in AA there is absolutely no
way that you can explain how it works.

THE COURT:　　　　So you can't answer that question?

THE WITNESS:　　　No.

Q.　　Let me understand this.

You were drinking for a period of time when your infant children
were at home with you; is that right?

MS. SOBAL:  Objection.  Infant children?
MR. CAPETOLA:　　They are not 18.

THE COURT:　　　　Children under 18 are known as infants
　　　　　　　　　here.

A.　　Yes.

Q.　　And did you keep alcohol hidden around the house?

MS. SOBAL:　　　　Objection.

THE COURT:　　　　Overruled.

A.　　Yes.

Q.　　And periodically in the middle of the night you would sneak a drink?

MS. SOBAL:　　　　Objection.

THE COURT:　　　　Overruled.

MS. SOBAL:　　　　Sneak a drink?  That doesn't mean she is sneaking.

THE COURT:　　　　Overruled.

A.　　Yes.

Q.　　And in addition to sneaking a drink now and then, you drink in front of the kids
around the house?

A.　　Yes.

Q.     And when you were drinking and you became intoxicated, were the children around?

A.     Yes.

Q.     You became intoxicated in front of the children on a fairly regular basis for a period of time; isn't that so?

A.     Like I said, most of that was confined to the evenings after the children had gone to bed.

* * * * *

Q.     You drank when they went to bed most of the time?

A.     Yes.

* * * * *

Q.     Your life was severely affected by your drinking, yes?

A.     It would have been affected if I continued in that manner, yes.

Q.     But it hadn't been affected by the time you went into the Kenilworth and Tharagay Clinic?

A.     It depends on how you specify as being affected.

Q.     Well, affected in the sense that you had dependance on alcohol that took precedence over other things?

        MS. SOBAL:          Objection, you Honor.  There is no establishment that it took precedence over anything.

        THE COURT:          Overruled.

A.     As I mentioned before, I was a functioning alcoholic.  So even though I was drinking.  I was still able to perform everything I needed to do for the children on a daily basis.

Q.     What do you mean by a functioning alcoholic?  What do you mean by that term?

A.      Well, I was able to get the boys to school on time.  I made every single parents' meeting.  Their meals were cooked.  They were up for school.  Everything they needed for school they were provided for.  They left for school on time.  They came home for lunch.  There was lunch for them.  They came home after school.  I took them to their activities.  I picked them up from their activities.  I cooked them their dinner.  I did homework with them.  I got them to bed on time.  That's what I mean.

\* \* \* \* \*

Q.      You admit that you are powerless over the alcohol substances that you ingested?

MS. SOBAL:  Objection, your Honor.

THE COURT:      Overruled.

A.      Yes.

Tr. at 745 to 750.

Tristan was apparently, having some problems in school.  He failed the third grade in 2007.  In evidence is a Swiss document entitled the "Situation Report" prepared by the Office for the Protection of Children of the County of Valais, dated August 12, 2009.  (Resp. Ex. J).  The following facts appear in this Report, material with regard to the issues in this proceeding:

Mr. Blatt also expressed his worry towards the attitude of Mr. Perris with his children, namely that they would have slept in the same bed as him.  This was explained by the fact that the children who were bored had asked for that.

Mr. Perris brought an action for libel against Mr. Blatt following paedophilla comments expressed towards him.

\* \* \* \* \*

Afterwards the contacts we had with the Blatt family concerned Keenan's request to go live in the United States.

Ms. Smyth was very ambivalent towards this request, being conscious that she should hear the wish of her son but not able to bring herself to let him go.  Then she hesitated several times between approval and refusal, putting Keenan in

an uncomfortable position.

* * * * *

4. Opinion of the children

Keenan already expressed in November 2006 his wish to live in New York and felt carried along by the attitude of Ms. Smyth who accepted his departure, then refused it, and this several times.

Keenan also shared with us his difficulty to integrate in Switzerland, feeling different from the other children in Switzerland.

He was followed during the school year 2008-2009 by Ms. Genolet, psychologist, and showed a sadness towards this situation.

He also committed a few small criminal acts that seem linked to his personal distress.

Alexander is the one who had the least difficulties to integrate to life in Switzerland. He was able to protect himself from the parental conflict and didn't express any particular wish, he seemed to adapt to all situations that were proposed to him.

Tristan shows a certain uneasiness towards his schoolmates. He is older than them and has some academic difficulties. He thus feels to be on a different wavelength with them regarding his academic knowledge as well as his life experience, traveling a lot contrary to his schoolmates. Concerning the parental conflict, he seemed up to this year to be relatively spared from it. However, during our last meeting in May 2009, Tristan expressed a great sadness towards the situation as well as his feeling to be a burden for his mother.

5. Summary

During our follow-up we could observe Ms. Smyth's ambivalent attitude and her instability towards decisions, namely that concerning Keenan's departure. This was not favourable to a secure environment for the children.

Otherwise, the children showed difficulties to integrate in Switzerland, as Tristan's academic failures and Keenan's criminal acts tend to prove.

We also could never determine Mr. Perris's real role in the children's life, never knowing whether he was Ms. Smyth's (boy)friend.

We notice that the children's attitude is today clearly rejecting towards Mr. Perris and, even thought the words of Keenan, Alexander and Tristan may be exacerbated by the fact that they have lived with their father for a short while, we can't assert that they are only dictated by Mr. Blatt.

* * * * *

In our opinion, Ms. Smyth presents no objective danger for her children but we noticed that her inconsistancy (sic) in her attitude, opinions, etc. become more and more problematic for her children, who therefore lack clear reference points and a reassuring and coherent support.

6.      Proposal

Therefore, taking into consideration the above as well as the recent declarations of the children, we propose that the children be heard by a neutral specialized authority in the United States in order to assess the foundation of the opinion they've expressed, which is at the moment clearly rejecting towards the environment of their mother.

Staying at your entire disposal for any further information, (formal greeting)

OFFICE FOR THE PROTECTION OF CHILDREN

(Resp. Ex. J).

The criminal act by Keenan referred to in the Situation Report was a shoplifting incident about a month before Smyth left for Kenilworth. As stated previously, Smyth conceded that Keenan desired to live in the Untied States.

Q.      Okay.

And later on when Ms. Genolet saw him, she says that he showed sadness.

Was that sadness because he was not permitted to go to the United States when he wanted to leave in 2006?

A.      Yes, among other things.

Q.      So his desire to live in the United States is not some new circumstance

21

that's been going on since at least sometime in 2006, correct?

A.     Correct.

Tr. at 783, 784.

On September 3, 2009, Joelle Kung of the Swiss Federal Office of Justice sent certain Swiss school records to the Court. (Pet. Ex. 18). The covering letter stated that these "reports are considered public records". In these records is a document entitled "Report Concerning Keenan". The report indicated that Keenan is a pupil whose behaviour is reproachless. He is polite and shows respect for his teachers and peers. He has received no punishment during his three years in the Ayent Junior Secondary School. However, the report also says:

> Keenan is rather an introvert. He does not particularly seek the company of his peers and often remains outside the group. He sometimes suffers from not being well integrated into the class. He also lacks self-confidence, is seeking his way and is extremely concerned about his future.

Keenan was feeling sad and was seen by a psychologist, a Ms. Genolet, "almost once a week or once every two weeks." (Tr. at 797).

At the present time, Smyth attends Alcohol Anonymous ("AA") meetings 3 or 4 times a week. Tharagay had recommended that she attend AA meetings 4 times a week. These meetings are in different places. Three of these meetings are a 1 ½ to 2 hour drive. Together with the meeting itself, she is gone from the house for 4 to 5 hours, and does not get home until 10 or 10:30 pm. When she is at these meetings 3 or 4 times a week, Robert Perris takes care of the children.

Smyth candidly admitted that her alcoholism may have had an impact on her children before she went into recovery. (Tr. at 970). She also stated that her depression and alcoholism caused her to be an "absent mother" emotionally, at times. In addition, according to the report

from Kenilworth-Tharagay (Resp. Ex. 5), she struggled to face these conditions and the amount of damage her drinking had on her relationship with the children. The respondent had often stated his concern about Perris taking care of the boys. This feeling intensified when the boys told their father that Perris was sleeping in bed with one or more of them. The petitioner testified that Perris did sleep in bed with her sons on two occasions. However, she was unaware of any inappropriate touching. (Tr. at 1007). She explained that the children slept with him when they had nightmares. She also stated that the boys did not tell her that they did not like that situation. At various times, the petitioner has described Perris as her best friend and, her romantic companion. At other times she described the relationship as romantic but not physical. She also stated that Perris ceased being a babysitter.

On her redirect examination, the petitioner testified that, on October 8, 2008, the respondent ceased paying child support. The child support is 6000 francs per month for the three children, equivalent to $6,000 per month in American money. As a result, she was forced to seek government assistance through social services, which she would have to repay. Smyth testified that she suffered from an "incredible depression for years after the divorce". According to her, Blatt was abusive; she had an uncertain future in a foreign country on her own; and she was suffering from alcoholism. When informed of the Kenilworth facility in South Africa, she decided to attend at a time when the children would be with their father for most of the time she would be at Kenilworth. Also, she explained that when she attended AA meetings the children would spend the night with friends. During this time, Perris is there to prepare their meals, help them with their homework and get them into bed. As to her alcohol problem, Smyth stated that she is recovering. As to Dr. Favaro, the petitioner stated that she was not notified about the

children seeing him and never consented to his treatment.

As to Keenan's desire to live in the United States, Smyth testified that he has been expressing this choice for the past two or three years, since he was 12 or 12 and a half. She believes this interest started with a trip to Disneyland with Blatt and his new wife in October 2006, and also is stimulated by the promise of a car for his 16th birthday.

Although she has never denied contacts by Blatt with the children, the same has not been true as to her phone calls to the children in the United States.

As Smyth explained:

Q.   Have you had any other incidents with the telephone access, with having difficulty with telephone access?

A.   Yes.

Through - - I think every single time I've phoned there's been a problem. There's never any answer. I leave a message, sometimes they return my calls, sometimes they don't. Every time I phone these children are busy having dinner or they're going somewhere, they cannot speak with me, they're busy with friends, they have to go eat pancakes, they're going for a haircut, they're in the shower, they are never, never available at the arranged time that I'm supposed to call.

Q.   And you testified that you are concerned that you will never see your children or speak with them again because of all of these difficulties?

A.   Yes.

Q.   In communication?

A.   Yes.

Tr. 1110, 1112.

Concluding her testimony, Smyth stated that she never consented to the children's United States application for green cards or for a visa extension. In fact, she was never notified of any

of these applications.

## JOLIE ROTHSCHILD

Jolie Rothschild is a licensed master social worker and teacher. She is the owner and director of a firm called Visitation Alternative, which takes referrals from the Family Court, for, among other things, supervised visitation. Rothschild is qualified as an expert in the Family Court of Queens County. At the request of the Family Court, she supervised and observed a visit between the three children and their mother on August 12, 2009. After she observed what occurred at the visit, she submitted a letter report to the Court dated August 21, 2009. (Pet. Ex. 26). In her view, the visit "went well". Among her observations were the following: all three children hugged their mother and she and the children were affectionate; they participated in enthusiastic conversation; "there was laughter, humor, enthusiasm and affection throughout the remainder of the session"; Tristan, who was at first anxious and nervous, became more comfortable, held his mother's hand and "engaged her affectionately"; at one point Keenan laid his head on his mother's lap; and Alexander "engaged in conversation with energy and in this session as well".

Of importance in this hearing, Rothschild testified that she found the three boys to be mature for their age, articulate and intelligent.

BY MR. CAPATOLA:

Q.      Did you find the boys to be mature for their ages?
A.      Yes.

Q.      Did you find them to be articulate?

A.      Yes.

Q.      Did you find them to be intelligent based upon your observation of their

conversations?

A.      Yes.

                            *   *   *   *   *

Q.      Were they able to articulate, within the conversation they had with their
        mother, intelligently and to express words correctly?

A.      Yes.

Tr. at 455, 456.

## DR. ALAN M. LEVY

Dr. Alan M. Levy is a physician licensed to practice medicine since 1955, and is a board

certified specialist in adult and child psychiatry.  He is also a specialist in forensic psychiatry and

in child custody cases.  He was retained on September 9th or September 10th, 2009 to critique

the report of Dr. Peter Favaro, the respondent's psychological expert.

Dr. Levy stated that he was confused by Dr. Favaro's evaluation.  Initially, he noted that

the mother was not interviewed which created a "big void" and an incomplete evaluation.  As to

Dr. Favaro's diagnosis of post traumatic stress disorder ("PTSD") as to two of the children, Dr.

Levy stated that there were not enough facts to make that diagnosis.  He testified that there could

not be a diagnosis and treatment without participation by the petitioner, alone and with each

child and then with all three children.

Dr. Levy also strenuously disagreed with Dr. Favaro who stated that the DSM4 diagnosis

in the manual is not reliable.  In his view the DSM4 diagnosis is authoritative and is the most

reliable information in the field.  Dr. Levy's testified that Keenan does not have PTSD in that he

was not exposed to a traumatic event.

Interestingly, Dr. Levy commented on the maturity of children above the age of 14.  He

stated, "With older children, especially those above 14, the adolescent's preference generally should dominate".  (Tr. at 846, 847).  Having said that, Dr. Levy then went into a lengthy discourse attempting to explain his statement as to an adolescent's preference, including his statement that "maturity" includes a lot of factors, not only age.

> Q.      In terms of Keenan, who is 15 years of age, he's been saying he wants to live in the United States for three years, would you credit that request absent any other, overwhelming facts to the contrary?
>
> A.      I'd certainly take it seriously if he's that age and he's been saying it for three years.  I'd want to inquire more into it.
>
> Q.      You'd want to talk to him as to find out why?
>
> A.      Yes.

Tr. at 910, 911.

Dr. Levy also critiqued the Ortego Law Guardian Report; that emphasized the manipulation of the children by both parents inspired by the father on the older child; and the so called:  "candid rehearsed" responses.  However, he testified that, because he did not meet the boys, he could not disagree with Ortego's statement that "all 3 boys are intelligent, articulate, worldly, and demonstrate a level of maturity greater than their age".

Dr. Levy also conceded that alcoholism could have an adverse effect on the children and could cause anxiety, unhappiness, despair and stress to the children.  In addition, Dr. Levy testified that "the common wisdom is that you want to keep the children together".  He noted that "generally speaking, you would, the boys are close enough (in) age, you would probably think of keeping them together."  (Tr. at 931, 932).

> Q.      Given the fact of their ages, isn't it a fact that it would be inappropriate under most circumstances to separate the three boys wherever they may live.

A.      Yes.

Tr. at 944.

B)      <u>The Respondent's Case</u>

<u>ANRIC CARL ALBRECHT BLATT</u>

The respondent, Anric Carl Albrecht Blatt, was born on August 12, 1970, in Windhock, Namibia, Southwest Africa.  In 1987, he moved to South Africa to go to college.  He became a citizen of South Africa in 1995.  There was much discussion about his ID number, which is not relevant to any of the material issues in this Hague Convention Proceeding.  Blatt testified that he was never convicted of a crime.  The respondent and his wife operate a fund management company called Global Fund Exchange which specializes in alternative energy, clean technology, scarce critical and natural resources and water.  He is the chairman of the company and "runs" the business.

During his marriage to the petitioner, the family moved from South Africa to Hong Kong in June 1997 because of security concerns and, in addition, the petitioner was lonely and missed her family in Hong Kong.  The family lived in Hong Kong for 8 years.  Tristan was born in Hong Kong on November 22, 1997.  However, Tristan received a South African passport because "Ms. Smyth falsified his birth certificate . . .."  (Tr. at 1223).  The family then moved to Switzerland. The primary reason was a career move, so that he could establish his business in Switzerland. The second reason was affordability, because they already had a holiday chalet in Switzerland. Blatt originally owned the home in Switzerland.  In the judgment of divorce, he transferred the house to the petitioner, subject to a mortgage.  (<u>See</u> ¶ 6, Settlement Agreement, Pet. Ex. 14). After their divorce, he was obligated to make the payments on the mortgage.  To date, he has

paid $30,000, and maybe more on the mortgage on the Swiss chalet home of the petitioner.

Blatt started making support payments to the petitioner on January 1, 2008, prior to their divorce which occurred on March 31, 2008.  He paid 8000 Swiss Francs per month until the end of March 2009. At that time, Smyth used "rude language" to him and told him that the mortgage was not her problem.

Blatt testified that he had problems with his ex-wife with regard to access to his children. He didn't have the scheduled visitation on 3 or 4 occasions.  In 2006, he booked a trip to Florida and spent $10,000 setting up the trip and Smyth refused to send the children.  He stated that in August 2008 for a weekend in Europe, and in February 2009, the petitioner refused to send the children in violation of their agreement.  Blatt did travel with his children to Africa, France, Germany, Italy and, of course in the United States.  He testified that Smyth also obstructed his telephone conversations with his children, and changed her telephone number without his knowledge.  Blatt described an event which occurred in a Swiss Court during litigation in Switzerland between him and Smyth on April 8, 2009, when he was held for questioning for 4 to 5 hours and the children were "completely besides themselves with fear".  (Tr. at 1279).

As to Smyth's alcoholism, Blatt first heard of this problem in April 2009, when he saw a document from the Kenilworth Clinic.  He stated that he did now know of her four AA meetings a week, until this hearing.  Nor did he know about her blood alcohol problem in her December 2005 auto accident, until this hearing.  As to the involvement of Robert Perris, he first heard about Perris sleeping with his children in June 2009.  At that time, he advised Perris that he disagreed with this practice and that he should stop it immediately.  Nor did he know that Perris had been given a power of attorney over the children.  When the petitioner was in the Kenilworth

Clinic – without his knowledge – the respondent testified that there were problems as to the location and care of the children during this period. Also, there were ongoing litigation in Switzerland involving the divorce and the children.

Blatt discussed the educational phase of the childrens' lives with the petitioner. In particular, he discussed Keenan's desire to live in the United States and his wish not to go to the vocational school in Sion in Switzerland. Blatt also described the village of Anzere, where the children lived in Switzerland. It was a small village of about 300 residents, who are mostly older, retired people who have chalets in this seasonal ski resort. He also described Keenan's present school life in Oyster Bay Cove. According to Blatt, Keenan is now a busy teenager in a highly rated high school with a strict academic program. Keenan and Alexander both attend Oyster Bay High School. They either are transported by school bus or can walk to school in 10 minutes. Tristan, the youngest child, goes to the Oyster Bay Mount Vernon School. In the high school, Keenan and Alexander take courses in english, math, art, journalism, physical education, physics, chemistry and other regular high school subjects. They have been in school in Oyster Bay Cove since Labor Day, 2009.

In addition, Keenan participates in a number of school related activities, including basketball, cross-country running, journalism and the world history society. He is apparently very busy in school, including working on the school newspaper. He leaves home at about 8:00 a.m. and is not home until between 5:30 pm and 6:00 pm. Alexander plays football on the junior varsity. According to Blatt, Tristan is also doing remarkably well. He is in the sixth grade, having been held back a year in Switzerland. He is taking guitar lessons and is in the school band. Tristan has been given extra help at the Mount Vernon School and, according to his

father, loves school.  As far as grades, Keenan has been scoring A's and B's.  Alexander is earning  "basically straight A's".  However, Tristan is in classes with much younger children, because of his prior difficult academic history.  In addition, the children attend Catholic religious activities every Sunday and Blatt plans to baptize all of them.  Also, each of the children has friends, including Tristan who is extremely popular in school.

As to his own life in the United States, Blatt testified that he is married to Laura Louise.  With this marriage, he has an extended, tightly-knit Italian family.  Her father and mother live in nearby Woodbury.   The family is "extremely bonded" together and have a wonderful relationship with each other, with some friction, of course.  Blatt described the boys relationship with one another, in what the Court finds to be a candid response:

> Q.    Now, Mr. Blatt, in connection with your three boys, how would you describe their relationship with one another?
>
> A.    Extremely close, extremely tied, very respectful for most of the time. Sometimes they'll be typical siblings and fight, but for most of the time extremely bonded, extremely strong together.  They look out for each other and they work on projects together.
>
> I think they have, all three of them, have a wonderful relationship with each other and there are sub relationships between the three in that Keenan and Alexander have an extremely tight relationship and Alexander and Tristan have an extremely tight relationship.
>
> When you put all three together sometimes there is friction and, yet, Keenan has an extremely almost a guardianship-type relationship with Tristan, the youngest.
>
> Generally across the board I think they get along extremely well if you keep them busy and keep an eye on them.

Tr. at 1350.

Blatt related that there were certain phone calls by Smyth in which she was aggressive,

slurred her words and was screaming. In his view, she was intoxicated. He also had 6 or 7 similar late night phone calls with her. On those occasions, Smyth denied that she was drinking. On June 27, 2009, at the airport, he discussed the subject of their return to Switzerland with the boys. According to Blatt, they were crying and were very distressed at the thought of having to return and broke down emotionally a number of times. The respondent feels he did the right thing by retaining them with him in the United States.

On cross-examination, Blatt testified that he is married to his present wife, just over a year. His wife owns the home in Oyster Bay and another home in Colorado. Blatt was questioned in detail about the G:325 forms by the United States Citizenship and Immigration Service of the Department of Homeland Security for all three children. (Pet's Ex. 69 (Keenan), 70 (Alexander) and 71 (Tristan)). These applications are for permanent residence or to adjust status and are all dated August 19, 2009. Their current status is as a "visitor". The Court has some concerns about these unilateral applications by Blatt, which may violate the terms of his agreement with Smyth which states, that neither party shall make decisions without the other party.

On April 9, 2009, Blatt was questioned by Swiss police for 4 to 5 hours on the complaint of Smyth. This was a part of a series of litigations in the Switzerland Courts between the parties with regard to custody, visitation and other issues in their divorce proceeding.

On July 27, 2009, the date Blatt was supposed to return Alexander and Tristan to Switzerland, he registered the children in Oyster Bay School and applied in the Nassau County Family Court for temporary custody and other relief. He obtained an ex parte temporary custody order and an order of protection which were subsequently vacated by this Court.

## DR. PETER FAVARO

Dr. Peter Favaro is a psychologist, who is experienced in court proceedings, having been appointed by various courts on many occasions in divorce proceedings. Blatt and the children were referred to his office by attorney Anthony A. Capetola. Originally he was called in for therapeutic reasons, and he was later asked to prepare a report and testify in this proceeding. Dr. Favaro saw the three children, Blatt and his wife. He testified that he asked Blatt to contact Smyth and offer her an opportunity to participate. However he never received any communication from Smyth or her attorney. As stated above, his original role was to provide therapy to the three boys, and then it changed to a forensic role. In that regard he rendered opinions and a report.

Initially, Dr. Favaro met with Blatt and his wife on August 10, 2009. They discussed Blatt's concerns about sending the children back to Switzerland. Blatt asked him to counsel the children, who, according to Blatt, did not want to return to Switzerland and were upset by telephone calls from their mother. Dr. Favaro did see the boys individually, and, in one session as a group. He saw the boys in one-half hour sessions on six occasions. In these sessions, Dr. Favaro had a good rapport with the children. He described Keenan as sensitive, thoughtful and intelligent. As to Alexander, it was more difficult to establish a rapport. However, Dr. Favaro found him to be polite, happy and of average to above average intelligence. Tristan was emotionally volatile, bordering on explosive. He tends to worry and fret. However, he is perfectly well-mannered, respectful, and has at least average intelligence. Dr. Favaro testified that Tristan is probably an underachiever.

Dr. Favaro stated that, in his opinion, the children expressed to him their true feelings

without being polarized.  They love their mom and their dad.  The boys want to stay in the

United States with their father, and do not want to return to Switzerland.  There is no doubt that

they love their mother and want to visit with her and spend time with her.  However, they do not

want to live in Switzerland.  His testimony as to Keenan's wishes, is as follows:

> On to Keenan, he also reported to me about a car accident his mother had where he felt that she was behaving in a somewhat silly fashion and he thought she was under the influence of alcohol.

> Keenan hurt his knees during that incident which made him upset.

> Q.     Was this incident that you are describing now an automobile accident?

> A.     Yes.

> Q.     Okay.

> A.     He said he was frightened during this accident because his mother had hit several cars with her car.

> He apparently banged up his knees and wanted his mother to give him medical help, and, again, I'm not commenting on the accuracy of what he said, but he reported his mother wouldn't take him for medical help.

> One of the reasons he said he wanted to stay is because he is frightened about his mother drinking.

> He has found what he considered or he describes as bottles of alcohol that she has hidden in the house, and that has made him upset.

> He was also made very upset by the knowledge that mother was going for some cancer treatment.  And then, again, upset after he found out she was going for not cancer treatment but substance abuse treatment.

> As far as this child is concerned, he was very, very upset and very, very saddened that in Switzerland he was an outcast of a social group.  Both he and Tristan talked about bullies and being called names.  He told me, I was only able to make one friend in Switzerland, and that was ultimately a boy who got in trouble for smoking pot and for stealing.

Tr. at 254, 255.

Dr. Favaro testified that, in his opinion, the boys were expressing their emotions based on their experiences. "These children were speaking from their heart." (Tr. at 256). As to their level of maturity, Dr. Favaro testified as follows:

> Q. Based on everything you found up to this time in your interview, what was the level of the boys' maturity in terms of being able to converse with you and understand their surroundings around them?
>
> A. Certainly the eldest child, Keenan, is beyond his chronological age with respect to his maturity.
>
> With respect to Tristan, he is about at his chronological age in terms of his maturity. He is probably better than most kids his age at expressing his feelings. So I would say he is a more sensitive, more self-expressive child than most of the children I have seen his age.
>
> Alex is at least at his age level of maturity and possibly more.
>
> All the children, because of the experiences that they had in terms of their world travel, and the fact that they are able to speak the second language, all of the children are probably a lot more mature than most American kids their age because they have seen much more of the world than most of the kids, and they have already become fluid in more than one language, which is certainly beyond the maturity level of most of the children who are raised here in the United States. They are also far more respectful than most of the children - - than their age peers in the United States.

Tr. at 259, 260.

Dr. Favaro also stated his opinion that the impact on children by an alcoholic parent is "potentially catastrophic". (Tr. at 260). He referred to the potential harm to children if a person is driving while intoxicated. The children advised him that they had been in motor vehicle accidents while passengers in their mother's car. During Dr. Favaro's testimony portions of the Kenilworth Clinic and Tharagay House medical records were introduced in evidence. (Resp. Ex.

5).  These records offer insight as to the reasons for the petitioner's stay at these facilities and the nature of her alcoholism.

Dr. Favaro also was asked for his opinion, based on his interviews with the children and his experience as a psychologist, as to whether the children had the ability to make an informed decision as to where they want to reside.

BY MR. CAPETOLA:

Q.  Dr. Favaro, based on the interviews you had with the children and based on your experience, did you have an opportunity to form an opinion within a reasonable degree of psychological certainty as to whether or not the children had the ability to make an informed decision as to their determination as to where they want to reside?

A.  Yes.

Q.  And did they tell you their opinions?

A.  Yes.

Q.  And what were their opinions as to where they want to reside?

A.  Keenan wants to reside in the United States in his father's residence. Tristan wants to reside in the United States in his father's residence.  And Alex wants to reside in the United States in his father's residence.

Tr. at 273, 274.

In fact, according to Dr. Favaro, Keenan told him that "it would take an army of policemen to get him on the train (sic), and if he went there he would run away."  (Tr. at 276, 277).  Dr. Favaro also was asked his opinion on the other material issue in this hearing; whether there were grave risks to the children.  As to this subject, this Court has concerns as to whether this is the appropriate province for an opinion by a psychologist.  In the Court's view, this is a decision to be made by the Court on the evidence of the mother's conduct, adduced at the

hearing, rather than by the opinion of a psychologist. In any event, there are too many contingent events in the answer of Dr. Favaro to be of assistance to the Court in regard to the issue of grave risk.

The Court has another problem with the testimony of Dr. Favaro in that he stated that both Keenan and Tristan were suffering from a post traumatic stress disorder. In this regard, the Court accepts the testimony of Dr. Alan M. Levy, the child psychiatrist. Dr. Levy testified that there was not enough evidence to substantiate such a diagnosis. The Court agrees. There is no evidence of exposure to an extreme traumatic stress involving death or serious injury, including, of course, the prospect of the return to Switzerland.

On the subject of separating the three boys, Dr. Favaro firmly opposed such a possibility, as follows:

> Q.     Dr. Favaro, do you understand the concept of bonding in this case between three brothers?
>
> A.     Yes.
>
> Q.     And is there a psychological impact upon boys who might be separated by the Court's order in this case?
>
> A.     Yes.
>
> Q.     And can you describe that circumstance to the Court?
>
> A.     I think it would be catastrophic for them emotionally. These are very, very close brothers. Again, you know, I attribute it to both parents. But there's a team. There's a tremendous amount of solidarity between these kids. They do not fight like most siblings I've seen. They are generous towards one another. They are good kids. They are affectionate towards one another.
>
>         These parents have managed to raise three of the most loving boys I've ever seen, and I've seen a lot of kids.

Q.      What would be the affect of Keenan remaining here and the other two
        returning?

A.      I think the younger brothers would be lost.  It's very, very clear that the
        two younger ones look up to their older brother, and it's very, very clear to
        me that their elder brother is a substantial source of positive impact on the
        two younger children.

Tr. at 287, 288.

REPORT OF THE LAW GUARDIAN

At the beginning of the hearing, the petitioner read into evidence the report by Joseph J.

Ortego, Esq., the law guardian appointed by the Court by order dated August 11, 2009.  (Pet.

Exh. 1).  The law guardian met with the three children in his office on August 12, 2009.  Prior to

meeting the children, the law guardian reviewed all the pleadings and documents on file in this

case.  The key portions of the report by the law guardian are set forth as follows:

General Observations

All three boys are intelligent, articulate, worldly, and demonstrate a level
of maturity greater than their age.  All three boys were adversely affected by their
parents' contentious divorce and appear to have been involved and manipulated
unnecessarily by both parents in their past and current domestic disputes.
Responses by each boy were at times remarkably repetitive, utilizing language
inconsistent with the individual boy's usual vocabulary.  At times each boy's
response seemed contrived and/or rehearsed.  My interviews of Keenan,
Alexander, and Tristan were focused on their physical and mental well being and
their preferences and views.

Physical and Well Being of Keenan, Alexander, and Tristan

I was unable to substantiate any facts or allegations that any of the boys
were exposed to a grave risk of physical or psychological harm or an intolerable
situation either in the maternal or paternal homes.

It was apparent to me that the problems all three boys had with their
maternal home environment originated from a badly handled divorce and not
abuse, or mistreatment from the mother.  The boys indicated in conclusory terms
that their mother was a liar.  When asked how they learned the truth of their

mother's misstatements, they all answered it was through their father.  All three boys also indicated that their mother was an alcoholic who received treatment in South Africa, that she attended some form of group therapy three times a week (which they referred to as "happy meetings"), and that she was very concerned with her finances including the father's alleged failure to pay child support.  When asked for more details about their mother's drinking, all three boys could only give vague responses.  For instance, Tristan said he saw his mother drink wine, Alexander said his mother acted silly, and Keenan said that she must have been driving drunk because she had four accidents in four years.  One of the boys described one of the accidents as involving snowy conditions and the mother skidding into parked cars.

The boys also reported that the mother dated Robert Perris who remained friendly with the mother and acted as a babysitter.  The two younger boys reported a close relationship with Perris but denied that Mr. Perris ever made them uncomfortable or touched them inappropriately.  Keenan, the eldest (15 years old) on the other hand, stated that he didn't like that he had a relationship with his younger brothers.  Keenan also said that he didn't have a relationship with Mr. Perris and just generally "stayed away".  According to the boys, Mr. Perris operates and/or owns an adventure camp for children in his town and has done so for many years.  An incident that warrants concern is a report that Tristan, the youngest boy, slept in a bed with Mr. Perris on two separate occasions.  This was explained by the boys that at times Tristan did sleep in the same bed with Mr. Perris and the mother when he had difficulty sleeping.  Tristan and the other boys reported no inappropriate conduct the two times Tristan slept in the bed with Mr. Perris without his mother who was not home.  It is my understanding from the boys that the father spoke to Mr. Perris, and this activity has stopped.  Mr. Perris is also no longer the babysitter.

All three boys were angry with their mother for lying to them about a trip she took to South Africa.  She told the children that she needed to go to South Africa for cancer surgery.  The children were informed by their father that the mother was in a mental institution or facility in South Africa, and she had not told them the truth.

*  *  *  *  *

The boys also expressed anger about Alexander's need to repeat the third grad and is continuing to struggle in school.  The boys blame the mother's lack of interest and her failure to get him help (tutoring).  I noted to the boys that it appears that the difficulty in school coincided with what appears to be the height of the divorce proceeding.  Also attached as an exhibit to one of the court pleadings is a statement from the management of the School of Ayent where the boys attend, indicating that the boys have had no specific problems and that

relations between the school and Mrs. Smyth have always been on good terms, and they have been able to count on her support at all times.

As for the father, all three boys only had complimentary things to say. They all stated that their father was their "role model". They reported that their father teaches them manners. Keenan is particularly impressed by the father's home in Glen Cove, the fact they have a housekeeper, two acres of property, a pool, and has bought them "snazzy clothes." On the other hand, Keenan complained that his mother did not dust well which caused his allergies to flair up.

Preferences

All three boys expressed a desire to live with their father in New York and not with their mother in Switzerland. Keenan, the oldest boy, was adamant about remaining in New York with his father, while Tristan and Alexander expressed the same desire. The younger boys are attached and aligned with their older brother Keenan and don't want to be separated from him. All three children expressed equal love for both parents but believed the opportunities, including education and home geographical environment in New York, to be better. Keenan also expressed the need to have strong male influence of his father at this stage of his life.

Although the boys at times expressed displeasure with their Switzerland home, both the Oyster Bay Cove, NY and the Switzerland resort town both present rich environments for the boys in all respects.

## V. **DISCUSSION**

A.   The Hague Convention - The Standards

In 1988, Congress enacted statutory relief and remedies for international child abduction

situations. Commonly known as the Hague Convention Rules, and set forth in 42 U.S.C.

§ 11601, the statute reads as follows:

§ 11601.   Findings and declarations

(a)   Findings

The Congress makes the following findings:

(1)   The international abduction or wrongful retention of children is

40

harmful to their well-being.

(2)　　Persons should not be permitted to obtain custody of children by virtue of their wrongful removal or retention.

(3)　　International abductions and retention of children are increasing, and only concerted cooperation pursuant to an international agreement can effectively combat this problem.

(4)　　The Convention on the Civil Aspects of International Child Abduction, done at the Hague on October 25, 1980, establishes legal rights and procedures for the prompt return of children who have been wrongfully removed or retained, as well as for securing the exercise of visitation rights. <u>Children who are wrongfully removed or retained within the meaning of the Convention are to be promptly returned unless one of the narrow exceptions set forth in the Convention applies.</u> The Convention provides a sound treaty framework to help resolve the problem of international abduction and retention of children and will deter such wrongful removals and retention.

(emphasis added).

In <u>Diaz Arboleda v. Arenas</u>, 311 F.Supp. 336, 340 (E.D.N.Y. 336), Judge Garaufis set forth the framework governing this type of Hague Convention wrongful retention case, and this discussion is worth repeating here.

*Hague Convention Framework*

The Second Circuit has clearly laid out the "framework" by which a district court must examine a Hague Convention petition when the other country in question, like Colombia, is a signatory to the Hague Convention. *See Blondin v. Dubois*, 189 F.3d 240, 245-246 (2d Cir. 1999). The court has the authority to decide only the merits of the abduction claim, not the merits of the underlying custody dispute. *See id.* "The abduction claim is limited, initially, to a determination of whether the defendant has 'wrongfully removed or retained' the child; on this issue the plaintiff bears the burden of proof." *Id.* Once the petitioner meets this burden, however, the children "must be returned unless the defendant can establish one of four defenses." *Id.* The respondent must establish either of the first two defenses by clear and convincing evidence: either that (1) "there is a grave risk that [the child's] return would expose the child to physical or psychological harm or otherwise place the child in an intolerable

situation," *id*., the other defenses, (including that) "the child is well-settled in the new environment," *id*., need be proved by the respondent only by a preponderance of the evidence. In addition to these factors, the court also may take into consideration the preferences of an older child.

It is the so-called "narrow exceptions" that are the subject this hearing. Section 11601 provides that the statute empowers courts in the United States to determine only the rights under the Hague Convention, namely wrongful detention "and not the merits of any underlying child custody claims." 42 U.S.C. § 11601.

Article 13 of the Hague Convention sets forth the two exceptions referred to in Section 11601(a), which are the subject of the hearing in this case, as follows:

Article 13

Notwithstanding the provisions of the preceding Article, the judicial or administrative authority of the requested State is not bound to order the return of the child if the person, institution or other body which opposes its return establishes that -

\* \* \* \* \*

(b)     there is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation.

The judicial or administrative authority may also refuse to order the return of the child if it finds that the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of its views.

The Court will refer to the first exception as the "grave risk" exception. The Court will refer to the second exception as the "age and maturity" exception. The burden of proof as to each exception is set forth in 42 U.S.C. § 11603(e), as follows:

(e)     Burdens of proof

(1)     A petitioner in an action brought under subsection (b) of this section shall establish by a preponderance of the

42

evidence–

> **(A)** in the case of an action for the return of a child, that the child has been wrongfully removed or retained within the meaning of the Convention; and

> **(B)** in the case of an action for arrangements for organizing or securing the effective exercise rights of access, that the petitioner has such rights.

> **(2)** In the case of an action for the return of a child, a respondent who opposes the return of the child has the burden of establishing–

> **(A)** by clear and convincing evidence that one of the exceptions set forth in article 13b or 20 of the Convention applies; and

> **(B)** by a preponderance of the evidence that any other exception set forth in article 12 or 13 of the Convention applies.

Reviewing these burdens of proof, the Court must determine initially whether the petitioner has established, by a preponderance of the evidence, that her children were wrongfully retained by their respondent-father.

B.      The Petitioner's Burden of Proof

In order to obtain the benefit of the Hague Convention, the petitioner must establish that the three children were "habitual residents" of Switzerland. In this case, that designation is not disputed. Article 3 of the Convention sets forth the rule with regard to the "wrongful retention" of the children, as follows:

> **Article 3:** "The removal or the retention of a child is to be considered wrongful where-(a) it is in breach of rights of custody attributed to a person . . . under the law of the State in which the child was habitually resident immediately before the removal or retention; and (b) at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for

43

the removal or retention."

In this case, it is virtually uncontested that the petitioner had lawful custody pursuant to a Swiss Judgment of Divorce and Custody Agreement with regard to the three children; the children were habitually resident with her in Switzerland prior to retention; and the petitioner is properly seeking the return of the children after the respondent has retained them beyond the agreed upon visitation period.

It is clear and uncontroverted that the petitioner has established that her three children were wrongfully retained by the respondent. Their agreements gave custody to the petitioner and at the end of their visitation period they were not returned to her in Switzerland, as the respondent was obligated to do. Therefore, the Court must now decide whether the respondent-father has established either or both of the exceptions set forth in the statute. Has the respondent established, by clear and convincing evidence, that there is a "grave risk" that their return would expose the children to physical or psychological harm? (See Article 13(b) and 11603(e)(2)(A)). Has the respondent established, by a preponderance of the evidence, that a child "has attained an age and degree of maturity at which it is appropriate to take account of [the child's] views," and the child or children "objects to being returned." The Court will first address the "Grave Risk" " exception.

C)      The "Grave Risk" Exception

Under Article 13(b) of the Convention, the Court may decline to return the children to Switzerland if the respondent establishes, by clear and convincing evidence, that returning the children would "create a grave risk that his . . . return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." The "grave risk"

defenses was explained in <u>Blondin v. Dubois</u>, 238 F.3d 153, 162 (2d Cir. 2001), in the following terms:

> In other words, at one end of the spectrum are those situations where repatriation might cause inconvenience or hardship, eliminate certain educational or economic opportunities, or not comport with the child's preferences; at the other end of the spectrum are those situations in which the child faces a real risk of being hurt, physically or psychologically, as a result of repatriation. The former do not constitute a grave risk of harm under Article 13(b); the latter do.

Under the facts in this case, the evidence with regard to this exception presents a much closer question than the "age and maturity" defense. To start with the burden of proof is more severe. As set forth in <u>Addington v. Texas</u>, 441 U.S. 418, 99 S.Ct. 1804, 60 L. Ed 2d 323 (1979) and adopted by The Modern Federal Jury Instructions Section 73-3, the clear and convincing burden of proof is explained as follows:

> What does "clear and convincing evidence" mean? Clear and convincing evidence is a more exacting standard than proof by a preponderance of the evidence, where you need believe only that a party's claim is more likely true than not true. On the other hand, "clear and convincing" proof is not as high a standard as the burden of proof applied in criminal cases, which is proof beyond a reasonable doubt.

> Clear and convincing proof leaves no substantial doubt in your mind. It is proof that establishes in your mind, not only the proposition at issue is probable, but also that it is highly probable. It is enough if the party with the burden of proof establishes his claim beyond any "substantial doubt"; he does not have to dispel every "reasonable doubt."

The respondent contends that the petitioner's alcoholism, especially with regard to her driving, poses a grave risk of physical harm to the children. The petitioner conceded that, prior to her visit to the Kenilworth Clinic she was a "functioning alcoholic" and was powerless over alcohol. She admitted that she lied to the children as to the reasons for her going to the Kenilworth Clinic while her friend Robert Perris took care of the children. Also, occasionally,

one of the boys slept in the same bed as Perris.  However, there is no evidence of any untoward conduct by Perris.   When the petitioner returned from the clinic; as a "recovering alcoholic", she joined AA and goes to 3 to 4 meetings per week.  During that time she is away from the children and Perris affords some care to the boys during those periods.

In addition, the respondent asserts that Smyth had been involved in four car accidents.  In one such accident in December 2005, all three children were in the car and she collided with three parked cars.  She was convicted of driving while intoxicated.  In another accident in January 2008, she backed into a parked car, again with all three children in the car.  In a third accident in April 2009, the petitioner's car killed a deer.  The petitioner claims that she is a recovering alcoholic; no longer drinks; and attends three or four sessions of AA per week.  The respondent asserts that she is not cured of her malady and thus, is a danger to the children.  Both medical experts testified that an alcohol problem could cause anxiety and feelings of despair on the part of the children.  In sum, the respondent contends that returning the children to their mother in Switzerland could be "serious for their mental as well as their physical well being . . . [and] put them at a grave risk of harm . . .."  (Respondent's Brief at p. 26).

With regard to this "narrow exception," the respondent must prove, by clear and convincing evidence, that the risk to the children is grave, not merely serious, and expose the children to physical or psychological harm or otherwise place the children in an intolerable situation.  Initially, the Court notes that the United States Department of State made the following observation concerning the grave risk of harm exception; as stated in Frederick v. Frederick, 78 F.3d 1060,1069 (6th Cir. 1996):

> This provision was not intended to be used by defendants as a vehicle to litigate (or relitigate) the child's best interests.  Only evidence directly

establishing the existence of a grave risk that would expose the child to physical or emotional harm or otherwise place the child in an intolerable situation is material to the court's determination.  The person opposing the child's return must show that the risk to the child is grave, not merely serious.

* * * * *

An example of an "intolerable situation" is one in which a custodial parent sexually abuses the child.  If the other parent removes or retains the child to safeguard it against further victimization, and the abusive parent then petitions for the child's return under the Convention, the court may deny the petition.  Such action would protect the child from being returned to an "intolerable situation" and subjected to a grave rise of psychological harm.

The Frederick Court went on to state that "a grave risk of harm for the purposes of the Convention can exist in only two situations.  First, there is a grave risk of harm when return of the child puts the child in imminent danger . . . eg. returning the child to a zone of war, famine or disease.  Second, there is a grave risk of harm in case of serious abuse or neglect."  Id. at 1069.  The Court notes that neither of these potential risks are present in this case.

A review of the pertinent cases reveals the gravity of the "grave risk" exception, and the necessity of finding an intolerable situation.  See, Walsh v. Walsh, 221 F.3d 204, 219-221 (1st Cir. 2000) (where the petitioner father had an extremely violent temper, including violence directed at his own children, with a clear and long history of spousal abuse, fights and threats to kill, and fights with one son in the presence of his two youngest children, the grave risk was established, and "we do not come to this conclusion lightly");  Nunez-Escardero v. Tice-Meuley, 58 F.3d 374, 376, 377 (8th Cir. 1995) (that the father allegedly physically and sexually abused the mother, was held not sufficient); Flynn v. Borders, 472 F.Supp.2d 906, 912-914 (E.D. KY 2007) (In an affidavit of one child it is stated that the mother is frequently intoxicated; she may be smoking marijuana; she slaps and hits the younger child "from time to time" – held grave risk

47

not shown by clear and convincing evidence); <u>Tsarbopoulous v. Tsarbopoulous</u>, 176 F.Supp.2d

1045, 1059 (E.D. Wash. 2001) (the child, between four and six years of age, suffered sexual

abuse from her father; confirmed by expert opinion; held "grave risk" established).

A case of somewhat similar facts, as to alcoholism is <u>McManus v. McManus</u>, 354

F.Supp.2d 62, 69 (D. Mass. 2005). In <u>McManus</u>, the petitioner-mother drank to an excess on a

regular basis and physically disciplined the children. There were two incidents in the testimony

that involved physical or violent discipline. It was clear that the children had grown troubled

and fearful from the chaotic conditions and physical discipline to which they were subjected. A

court-appointed clinical psychologist guardian concluded that the children "were frequently

exposed to situations that put them at serious risk for current and future psychological harm . . .

[and] from a child's mental health prospective would constitute an intolerable situation." The

Court found that these facts were not sufficient to prove a grave risk of an intolerable situation.

In <u>McManus</u>, the Court reviewed some of the cases in which the grave risk exception was

established by clear and convincing evidence.

> Cases that have approved invocation of the Article 13(b) exception have
> focused on evidence of a sustained pattern of physical abuse and/or a propensity
> for violent abuse. *See, eg., Walsh*, 221 F.3d at 219-220 (finding grave risk of
> harm where petitioner had severely beaten his wife over a number of years,
> including while she was pregnant, many of the beatings took place in front of her
> small children, and petitioner had a history of other violent activity and of chronic
> disobedience of court orders); *see also Danaipour v. McLarey* 386 F.3d 289 (1st
> Cir. 2004) (affirming district court finding of grave risk of psychological harm
> where petitioner had sexually abused one of the two children whose return was
> sought).

* * * * *

> Guided by these principles, I conclude that the respondent has not
> established the existence of a "grave risk" by clear and convincing evidence.

Id. at 70.

Finally, the Court notes that the Second Circuit has emphasized that the grave risk exception is a narrow one. The rule as set forth in Blondin v. Dubois, 238 F.3d at 162 (2d Cir. 2001) (Blondin IV) quoting from Frederick v. Frederick, 78 F.3d at 1069 (6th Cir. 1996), is as follows:

> A "grave risk" exists in only two situations: (1) where returning the child means sending him to "a zone of war, famine, or disease"; or (2) "in cases of *serious* abuse or neglect, or extraordinary emotional dependence, when the court in the country of habitual residence, for whatever reason, may be incapable or unwilling to give the child adequate protection."

In this case, the only evidence approaching the "grave risk" level of conduct is the alcoholic history of the petitioner, coupled with the incident of her driving while intoxicated, and the caretaking of the children in her absence by her friend Perris. However, this potentially dangerous situation has been mitigated and may be resolved by the remedial actions of the petitioner. She apparently appreciated the seriousness of the situation by traveling to South Africa and entering a rehabilitation alcoholism program at Kenilworth and Tharagay for a period of a month. After that she joined the AA programs and attends three to four meetings per week. Further and significantly, the evidence reveals and the Court finds that the petitioner has been sober for more than sixteen months.

Accordingly, the Court finds that the respondent failed to establish, by clear and convincing evidence, that there is a grave risk that the return of the children to their mother in Switzerland would expose the children to physical or psychological harm or otherwise place the children in an intolerable situation.

D)      The "Age and Maturity" Exception

1)     <u>Do the Children Object to Being Returned to Switzerland?</u>

The first element that the Court will determine is whether the respondent established, by a preponderance of evidence, that one or more of the children "objects to being returned."  The undisputed evidence at the hearing clearly revealed that Keenan and Alexander object to being returned to Switzerland.  Also, the Court finds that, although less clear, Tristan also wants to remain in the United States.

Initially, Joseph J. Ortego, Esq., the law guardian appointed by the Court stated in his report to the Court, that "All three boys expressed a desire to live with their father in New York and not with their mother in Switzerland.  Keenan the oldest boy, was adamant about remaining in New York with his father while Tristan and Alexander expressed the same desire.  All three children expressed equal love for both parents but believed the opportunities, including education and home-geographical environment in New York, to be better.  Keenan also expressed the need to have strong male influence of his father at this stage of his life."  (Pet. Ex. 11).

In the petitioner's own testimony there is evidence that the boys do not want to return to Switzerland.  She stated in a telephone conversation with her children on August 8, 2009, that they were upset and were screaming and crying that they did not want to return to Switzerland.  Also, Smyth testified that, prior to filing this Hague Convention petition, Keenan had, for a period of approximately two or three years, on numerous occasions, at least since 2006, told her he wanted to live with his father in New York.  (Tr. at 704, 721, 722, 783, 784).

In addition, the Court spoke to the boys and they told him that they wanted to stay here in New York with their father and did not want to return to Switzerland.  The Court credits those

comments.

Accordingly, the Court finds that the respondent has established, by a preponderance of the evidence, that the three children, object to being returned to Switzerland. The Court finds that the children, of their own volition, desire to remain in New York with their father. The Court now turns to the second element of the "age and maturity" exception, namely, whether the respondent proved that one or more of the children has attained "an age and degree of maturity at which it is appropriate to take account of [the child's] views."

2)     The "Age and Degree of Maturity" Element

As stated above, the respondent has the burden of establishing the "mature" objection defense by a preponderance of the evidence. This difference in the burden of proof in contrast to the "grave risk" exception was explained in <u>McManus v. McManus</u>, 354 F.Supp. 62, 72 (D. Mass. 2005).

> Congress has added to the Convention's endorsement of the exception the codicil that the factual predicate for finding that a mature objection has been made need only be established by the customary civil action standard of a preponderance of the evidence. In contrast to the other exception argued for in this case, the prospect of a "grave risk" of physical or psychological harm to the child if returned, establishing the "objection" exception to return is not subject to a stringent burden of proof, and thus a court may more readily find a valid objection than it could find the existence of a grave risk. This difference in stringency of examination is expressly mandated by ICARA, 42 U.S.C. § 11603(e)(2).

The cases do not set any age limits when applying the mature objection defense, but there is considerable precedent involving children aged 11 to 14 having attained that type of maturity. Of course, it depends on the individual child and the particular factual circumstances of each case. As stated in <u>Blondin v. Dubois</u>, 189 F.3d 240, 247 (2d Cir. 1999), in applying the age and maturity exception, the Court must not focus solely on the general goal of the Convention to

protect children from wrongful retention, but must also "carefully determine that the particular child has attained an age and degree of maturity at which it is appropriate to take account of its view." Further, the Convention contains no age limit for applying the exception. Also, if a Court determines that the child's opinion is the product of undue influence, his or her wishes are not to be taken into account. In re: Robinson, 983 F.Supp. 1339, 1343-44 (D. Col. 1997).

The Court has reviewed the following cases as to the age of maturity. See DeSilva v. Pitts, 481 F.3d 1279 (10th Cir. 2007) (affirming the District Court decision that a 13 year old satisfied the mature objection defense when the child stated that he made friends in the United States; described his house here as "really big"; is on teams; and has a computer and everything he needs for school, which school was better than in Canada); Castillo v. Castillo, 597 F.Supp.2d 432, 441 (D. Del. 2009) (The bright 11 year old who expressed strong desire to remain in the United States, "displayed impressive maturity"); Laguna v. Avila, 2008 WL 1986253 (E.D. NY 2008) (A 13 year old likes school here; makes good grades; has made a lot of friends; and has no real friends in Colombia); Leites v. Mendiburu, 2008 WL 114954 (M.D. Fla. 2008) (A 13 year old feels that her home in the United States provides a calmer environment for her; she enjoys school, friends and sports; and believes she will have better opportunities in the United States); Matovski v. Matovski, 2007 WL 2600862 (S.D.N.Y. 2007) (the case involved three children, 12, 11 and 5; the 12 year old explained that she wished to remain in New York because she has more family and friends here and enjoys a more stable life here than in Australia; as to the 11 year old, it presented a closer question but she understood about telling the truth and offered straightforward answers to the questions posed to her; and she preferred to live in New York because of more family and friends); McManus v. McManus, 354 F.Supp.2d

62, 71 (D. Mass. 2005) ( the Court observed the children to be intelligent, mature and articulate;"
even though the 13 year old and 11 year old children were not as mature as the older brothers,
"they were able to understand and appreciate the circumstances concerning where they should
reside and were similarly able to form and express a thoughtful opinion deserving of respect.");
Diaz Arboleda v. Arenas, 311 F.Supp.2d 336, 343-44 (E.D.N.Y. 2004) (14 and 12 year old
children believed that they will have better opportunities in the United States).

On the other hand, as stated above in describing § 11601(a), like the grave risk exception,
the "age and maturity" exception is to be applied narrowly.  England v. England, 234 F.3d 268,
272 (5th Cir. 2000).  In England, the age and maturity defense was not sustained, as to a 12 year
old where she had four mothers and "has been diagnosed with Attention Deficet Disorder, has
learning disabilities, takes Ritalin regularly and is, not surprisingly, scared and confused by the
circumstances producing this litigation . . ..  We hold that the District Court erroneously found
Karina mature enough to trigger this exception to the Convention."  The Court notes that even in
this compelling case there was a vigorous dissent finding that, even with the negative facts stated
above, "Karina was of sufficient age and maturity."

In this case, a review of the evidence at the hearing reveals substantial evidence of the
maturity of 15 year old Keenan and 13 year old Alexander.  Joseph J. Ortego, Esq., the court
appointed law guardian after meeting with the children in his law office and questioning them at
length, stated the following:

> All three boys are intelligent, articulate, worldly and demonstrated a level
> of maturity greater than their age.
>
> All three boys expressed a desire to live with their father in New York and
> not with their mother in Switzerland.  Keenan, the oldest boy, was adamant about
> remaining in New York with his father, while Tristan and Alexander expressed

the same desire.  The younger boys are attached and aligned with their older brother Keenan and don't want to be separated from him.  All three children expressed equal love for both parents but believed the opportunities, including education and home geographical environment in New York, to be better.  Keenan also expressed the need to have strong male influence of his father at this stage of his life.

The petitioner herself testified that her boys were mature.

BY MS. SOBAL:

Q.      Have you been in this courtroom and heard testimony that your boys are mature, Ms. Smyth?

A.      Yes.

Q.      And are your boys mature?

A.      Well, the children generally respect adults who are not necessarily familiar with, who they do not know very well.  Adults with authority.  So they tend to switch into mature, serious, well-mannered.

THE COURT:          Excuse me.  They tend to switch?

THE WITNESS:        Switch.  Tend to be mature, serious, well-mannered if it is expected of them.  That's how they've been raised.

However, when they are with family members or friends, they are completely different people.  They are more - - they are joking about more.  They don't come across as serious or overly mature.  They are just kids, because they are in a relaxed environment.

Tr. at 560, 561.

Jolie Rothschild, the licensed social worker and teacher testified that she found the three boys to be mature for their age, articulate and intelligent.  (Tr. at 455, 456).  Dr. Peter Favaro, the childrens' treating psychologist reported that:  "All three children are mature and self-expressive.  They are thoughtful and self-reflective.  They are well-balanced in their approach to discussing their desire to remain in the United States."  (Resp. Ex. L).  In his testimony, Dr. Favaro stated

that Keenan was "beyond his chronological age with respect to his maturity." (Tr. at 259). He described Alexander as "at least his age level of maturity and possibly more." (Tr. at 259). As to Tristan, Dr. Favaro testified that he was a "more sensitive, more self-expressive child than most of the children I have seen at his age." (Tr. at 259). As to all three, he testified that they are "a lot more mature than most American kids their age." (Tr. at 260).

Accordingly, the Court finds that, the age and maturity of Keenan and Alexander coupled with the reasonable nature of their objections to returning to Switzerland, meets the narrow exception created by the Hague Convention defense of "age and maturity." The Court further finds that the respondent has established, by a preponderance of the evidence, that Keenan and Alexander both validly object to being returned to Switzerland, and they both have attained an age and degree of maturity, at which it is appropriate for the Court and the parties "to take account" of their views.

E)       The Three Children Should Not Be Separated

A review of this record indicates a complete lack of any testimony by any witness or any documentary evidence that the three boys should be separated. On the contrary, Dr. Favaro testified that separation would be catastrophic and that these are "3 of the most loving brothers I have ever seen." Dr. Levy, the petitioner's psychiatric expert, testified that it was "common wisdom" to keep the three children together and "the boys are close enough (in age) you would probably think of keeping them together". (Tr. At 931, 932). His testimony in this regard, is as follows:

> Q.       Given the fact of their ages, isn't it a fact that it would be inappropriate under most circumstances to separate the three boys wherever they may live.

A.     Yes.

Tr. at 944.

Accordingly, the Court finds that the three boys, Keenan, Alexander and Tristan should

remain together with their father, in the United States.

VI. <u>As to Visitation or Access Rights for the Petitioner</u>

Having determined that the Petition for return of the children must be denied because of

the age and maturity exception; the issue of visitation or right of access to the petitioner-mother

may become a paramount issue.  There is no question that these children need the advice and

care  of their mother.  Especially in view of the fact that she still has legal custody, their mother

probably is entitled to liberal visitation with the children in Switzerland and in the United States.

Access rights are synonymous with 'visitation rights'.

However, the scope of this Court's inquiry under the Hague Convention "is limited to the

merits of the abduction claim."  <u>Miller v. Miller</u>, 240 F.3d 392, 398 (4th Cir. 2001) (citing

ICARA 42 U.S.C. § 11601(b)(4)).  As such the issue of visitation or access is not properly

before this Court.  The rule was stated in <u>Wiggill v. Janicki</u>, 262 F.Supp.2d 687, 690 (S.D. West

Va. 2003).

> While federal courts undoubtedly have jurisdiction under the Convention
> and ICARA to act where children have been wrongfully removed from their
> country of habitual residence, that jurisdiction does not exceed to access issues
> and alleged breaches of access rights.  These issues are best left to the state courts
> that traditionally deal with this special area of the law.  See Fernandez, 121
> F.Supp.2d at 1126 (citing Bromley 30 F.Supp.2d at 862).

See <u>Fernandez v. Yeager</u>, 121 F.Supp.2d 1118, (W.D. Mich. 2000) ("Given the absence

of any specific remedy for rights of access, this Court believes that matters relating to access are

best left to the state courts, which are more experienced in residing those cases."); <u>Bromley v.</u>

56

Bromley, 30 F.Supp.2d 857 (E.D. Penn. 1998) ("We believe, therefore, that the plain language of the Convention does not provide federal courts with jurisdiction over access rights"); Janzik v. Schaud, 2000 WL 1745203 (N.D. Ill. 2000) ("The Convention does not preclude the petitioner from filing a claim for visitation rights in state court under the state's statute").

However, in regard to visitation rights to the petitioner, the Court takes notice of the very generous and frequent visitation rights offered to Anric Blatt in their divorce agreement. (See Pet. Ex 14). Without making any determinations, the Court is of the view that it would be appropriate for the petitioner to enjoy the same generous visitation rights.

## VI. CONCLUSIONS

The Courts finds and determines that the petitioner, Linzi Enslin Smyth, has proven, by a preponderance of the credible evidence, that (1) the three children, Keenan, Alexander and Tristan were "habitual residents" of Switzerland, and (2) they were wrongfully retained in the United States by their father.

The Court further finds and determines, that the respondent, Anric Blatt, failed to prove, by clear and convincing evidence, that there is a grave risk that the childrens' return would expose them to physical or psychological harm or otherwise place the children in an intolerable situation.

Further, the Court finds that the respondent, Anric Blatt, has established, by a preponderance of the credible evidence, that the three children, Keenan, Alexander and Tristan, object to being returned to Switzerland, and that both Keenan and Alexander have attained an age and degree of maturity at which it is appropriate to take account of the views of the children. The Court further finds that it is their wish and desire to remain in the United States with the

respondent.

In addition, the Court finds that the respondent has also established, by a preponderance of the credible evidence, that it would be extremely harmful to separate these children. The Court finds and determines that all three children should remain in the United States with the respondent, subject to the appropriate visitation rights to the petitioner.

Accordingly, the Petition by Linzi Enslin Smyth "For Return of the Children" pursuant to the Hague Convention, is denied.

**SO ORDERED.**

**Dated:  Central Islip, New York**
          **November 12, 2009**


                    _____/s/ Arthur D. Spatt_____
                          ARTHUR D. SPATT
                    United States District Judge